# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

SUE BRANNEN DIXON and JAMES M.　*
DIXON, JR., as surviving parents of　*
JAMES M. DIXON, III, and JAMES M.　*
DIXON, JR., as Executor of the Estate of　*
JAMES M. DIXON, III,　*
　　　　　　　　　　　　　　　　　　*
　　Plaintiffs,　　　　　　　　　　　*　　CV 214-47
　　　　　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
GEORGIA DEPARTMENT OF PUBLIC　*
SAFETY and ALBERT HARVEY　　　*
WILLIFORD, Individually,　　　　　*
　　　　　　　　　　　　　　　　　　*
　　Defendants.　　　　　　　　　　*

## ORDER

On February 19, 2012, a Special Weapons and Tactics ("SWAT") team from the Georgia Department of Public Safety ("DPS") responded to a situation involving a barricaded gunman in Appling County, Georgia. A little less than two hours after the first member of the SWAT team arrived, one of the SWAT team members, Defendant Albert Harvey Williford, shot and killed the subject of the SWAT team's operation, James M. Dixon, III. This suit was brought against DPS and Williford individually by Dixon's parents and particularly his father, as Executor of his Estate. Presently before the Court is Defendants' Motion for Judgment on the Pleadings. Dkt. No. 6. Upon due consideration, Defendants' Motion is **GRANTED IN PART**, as to Plaintiffs' state law claims against Williford, and **DENIED IN PART**, as to Plaintiffs' state law claims against DPS and federal claims against Defendant Williford, as explained herein.

1

## I. Factual Background[1]

On the morning of February 19, 2012, in Appling County, Georgia, a DPS SWAT team "responded to a mandatory DPS SWAT call out activation for a barricaded gunman, James M. Dixon, III[.]" Dkt. No. 1-1, ¶ 18. According to Plaintiffs, the SWAT team members who responded were acting within the scope of their official duties as DPS employees and were acting under color of state law. Id. at ¶¶ 19-20. Fourteen members of the SWAT team arrived at the designated call-out location between 6:49 am and 8:35 am. Id. at ¶¶ 21-34. Defendant Albert Harvey Williford was the third SWAT team member to arrive. He arrived at approximately 7:32 am. Id. at ¶ 23. Brian Stone arrived in a DPS Bearcat armored vehicle at roughly 7:35 am. Id. at ¶¶ 9, 27. Jeff Cain, the CNT crisis negotiator, was the eleventh SWAT team member to arrive. He arrived at about 8:25 am. Id. at ¶¶ 13, 31.

Plaintiffs point out that "DPS has clearly defined regulations regarding the composition and conduct of a DPS SWAT TEAM responding to a barricaded gunman call-out which James M. Dixon, III constituted on February 19, 2012." Id. at ¶ 37. DPS Policy # 25.02 provides for the designation of a single Tactical Team Commander on any given call-out activation, and the SWAT team members become subordinates to that person until the Tactical Team Commander determines that the activation is over. Plaintiffs allege that the SWAT team that responded to Dixon's location "failed to designate a single Tactical Team Commander during the CALL-OUT[,]" as was provided for in the DPS policy applicable to barricade situations. Id. at ¶¶ 41-47.

To support these allegations, Plaintiffs report the seemingly different understandings of several officers about who was in charge and what the plan was in responding to the situation.

---

[1] "In determining whether a party is entitled to judgment on the pleadings, we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014) (citation omitted).

AO 72A
(Rev. 8/82)

According to Darrell Thigpin, Williford was communicating commands from DPS SWAT Commander Lieutenant Steven Bone[2] to the SWAT team. Id. at ¶¶ 10, 36, 48. Thigpin expressed that Williford conveyed Bone's commands that Dixon was to be contained inside the team's perimeter, and the team was only to take action if Dixon tried to leave or made an aggressive action toward the SWAT team. Id. at ¶¶ 48-49. Williford expressed that, upon his arrival, he "assumed the lead position for dispatching Georgia State Patrol SWAT to handle the situation[.]" Id. at ¶ 50. In contrast, Josh Augusta reported that Mark Lamb was in charge, as he "was the senior member of the team" and because "none of the full time SWAT Commanders [were] on scene at the time[.]" Id. at ¶¶ 4, 8, 51. Augusta also stated that DPS SWAT Sergeant Greg Shackelford[3] commanded him to drive the Bearcat to Dixon's front yard. Id. at ¶ 52.

According to Bone, the team's objective was to "[s]et up a perimeter around the residence and prevent the suspect from leaving[.]" Id. at ¶ 53. Chris Cuddington said the team's plan was to "negotiate the suspect from the residence. If negotiations failed, then chemical agents were to be used to persuade the suspect into surrendering[.]" Id. at ¶¶ 6, 54. Patrick Orr expressed that the team's plan was to secure the area around the residence and to deploy gas to persuade Dixon's surrender if negotiations failed. Id. at ¶¶ 11, 55. Blake Swicord, the highest ranking SWAT team member on the scene before Dixon was shot, stated that the plan was to make announcements to Dixon, who was barricaded in the residence and would not respond to local law enforcement regarding a warrant for his arrest. Id. at ¶¶ 14, 56. Swicord also stated that gas would be deployed, and the officers would eventually enter the residence to take "the primary suspect" into custody. Id. at ¶ 56. Plaintiffs allege that Williford and Lamb, in contrast,

---

[2] Bone did not arrive at the call-out location until after Dixon was shot. Id. at ¶ 36.
[3] Shackelford, like Bone, did not arrive at the call-out location until after Dixon was shot. Id. at ¶ 36.

AO 72A
(Rev. 8/82)

never reported that the plan was to deploy chemical agents or gas if negotiations with Dixon failed. Id. at ¶¶ 57-58.

According to DPS Policy # 25.08, it is the "policy of the Georgia Department of Public Safety to provide crisis negotiators, when determined by the SWAT Commander, to communicate effectively with any potential suicide victim . . . or barricaded gunman, regardless of motivation[.]" Id. at ¶ 74. Plaintiffs maintain that DPS sent Cain, a crisis negotiator, to the call-out location in order to provide effective communication with Dixon. Id. at ¶¶ 75-76. Plaintiffs contend that Cain never communicated with Dixon. Id. at ¶ 77. Instead, Plaintiffs allege that Lamb, who is not a crisis negotiator, was the only DPS SWAT team member who communicated with Dixon prior to his being shot. Id. at ¶¶ 78-79. Plaintiffs further allege that Lamb never commanded Dixon to disarm or he would be shot. Id. at ¶ 80. According to Plaintiffs, Lamb's communication with Dixon was ineffective. Id. at ¶ 81.

DPS Policy # 25.02 additionally provides that a DPS SWAT team should establish an inner and outer perimeter around a barricaded gunman. Id. at ¶ 67. Plaintiffs allege that the SWAT team failed to exercise due care in executing this rule, because the team failed "to relocate Appling County Deputy Sheriffs and/or other local law enforcement personnel to a safe position outside of the DPS SWAT TEAM's perimeter." Id. at ¶ 68. Several SWAT team members were reportedly concerned for the safety of the deputy sheriffs and other local law enforcement personnel because of their proximity to Dixon's residence. Id. at ¶ 69. Swicord did not feel comfortable with the SWAT team members or deputies being as close as they were to the residence because he had heard that "the suspect possibly had a long gun." Id. at ¶ 70. Swicord instructed Lamb to tell the Appling County authorities to back away from the residence, but he was told "that the Appling County officials had already been advised[.]" Id. at ¶ 71.

4

According to Plaintiffs, after the SWAT team's arrival at the call-out location, Dixon never tried to leave the call-out location. Id. at ¶ 59. In the minutes before his death, Dixon "turned off the ignition to his running vehicle, removed the keys from the ignition and tossed the keys to his vehicle into his yard." Id. at ¶ 60. Plaintiffs allege that, after the SWAT team's arrival at the call-out location, Dixon "never made an aggressive action toward the DPS SWAT TEAM." Id. at ¶ 61. The DPS SWAT TEAM never deployed any chemical agents or gas. Id. at ¶ 62. Instead, Williford thought that the personnel from the Appling County Sheriff's Office "were still too close to the scene for safety" and "decided to engage [Dixon] at this time to de-escalate the situation before it got worse[.]" Id. at ¶ 72. At approximately 8:42 am, Williford fatally shot Dixon. Id. at ¶ 35. DPS SWAT Commander Lieutenant Steven Bone, Sergeant Greg Shackelford, and Corporal Shannon Dockery arrived at the call-out location after Dixon was shot. Id. at ¶ 36.

Plaintiffs allege that the DPS SWAT Team failed to exercise due care in several respects in the execution of the DPS regulations, particularly in: failing to establish a single Tactical Team Commander, failing to follow Bone's call-out directive to take no action unless Dixon attempted to leave or made an aggressive action towards the SWAT team, failing to deploy chemical agents or gas, failing to establish an inner and outer perimeter, and failing to effectively communicate with Dixon. Id. at ¶¶ 47-82. Plaintiffs allege that these failures caused Dixon's death, and that DPS should be held liable under state law. Id. at ¶¶ 84-87.

With regard to Williford specifically, Plaintiffs allege that Williford's conduct occurred at the call-out location during the process of attempting to arrest Dixon and prior to any detention on the charges for which Dixon's arrest was being sought. Id. at ¶ 92. Plaintiffs allege that Williford's use of force in seizing Dixon was abusive, objectively unreasonable and excessive, in

AO 72A
(Rev. 8/82)

violation of Dixon's rights under the Georgia and United States Constitutions. Id. at ¶¶ 97-105. DPS Policy # 10.01 provides that "[t]he evaluation of a member's use of force will be undertaken from the perspective of a reasonable member on the scene" and officers "shall exhaust every other reasonable means available to [him] before resorting to the use of deadly force[.]" Id. at ¶¶ 106, 108. Plaintiffs allege that, during the call-out, Dixon never made any effort to use the firearm in his possession, never pointed the firearm in his possession at anyone, and never physically or verbally resisted any law enforcement officer. Id. at ¶¶ 110-112. Plaintiffs, in sum, maintain that the level of force Williford used was objectively unnecessary, excessive, and unreasonable, and that his conduct is actionable under 42 U.S.C. § 1983. Id. at ¶¶ 114, 116.

## II. Evidentiary Issues

Defendants ask the Court to take judicial notice of a warrant for Dixon's arrest, which was issued by the Magistrate Court of Appling County at 6:47 am on the morning of February 19, 2012. Dkt. No. 6-2, p. 3; Dkt. No. 6-1 (warrant). According to Defendants, the warrant demonstrates that, before any SWAT officers arrived at the call-out location, an arrest warrant was taken out for Dixon which charged him with aggravated assault. The warrant described that Dixon shot a high power rifle into Rhonda Hartzog's residence. Id. While Plaintiffs agree with Defendants that "a district court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a Rule 56 motion[,]" Halmos v. Bomardier Aerospace Corp., 404 F. App'x 376, 377 (11th Cir. 2010) (internal citations and punctuation omitted), and ask the Court to judicially notice two separate items, Plaintiffs object to the Court taking judicial notice of the arrest warrant. Plaintiffs do not dispute that the warrant is a public record but rather maintain that Defendants have failed to show that the law enforcement personnel at issue knew

about the issuance or existence of the record such that it could have influenced their reasoning at the call-out location. Dkt. No. 12, p. 4. Defendants respond, in part, by arguing that "it is not plausible that the troopers on the scene would not be told of the subject's dangerous activities that brought them there[.]" Dkt. No. 15, p. 7.

At this stage in the proceedings, while the existence of the warrant may be a fact capable of accurate and ready determination "from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), the Court may not properly take judicial notice of the more controversial facts that Defendants seek to have the Court acknowledge: that all of the law enforcement officers present at the scene knew about the existence of the arrest warrant and the full details of the circumstances justifying its issuance.

Plaintiffs request that the Court take judicial notice of two public records: (1) the Appling County Sheriff's Department police cruiser dash-cam from the morning of Dixon's death, Dkt. No. 12-1, and (2) a statement provided by Cain to Bone from the Georgia Bureau of Investigation's investigative file, Dkt. No. 12-2. Dkt. No. 12, p. 5. Defendants argue that this is an improper attempt by Plaintiffs to amend their Complaint without amending it, according to Federal Rule of Civil Procedure 15, and in any event, the information supplied by Plaintiffs only further supports Defendants' arguments. Dkt. No. 15, pp. 1-2.

The Court is aware that the Eleventh Circuit has deemed it appropriate in certain cases to allow public records to be considered at an early stage without requiring automatic conversion to the summary judgment stage, for example, in cases involving public records on file with the SEC. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1275-81 (11th Cir. 1999). However, as aforementioned, the parties in this case do not merely want the Court to acknowledge the existence of the public records at issue, rather, they would have the Court consider the contents

7

of those records and impute knowledge of the contents of the records to the many different actors involved in this case. Thus, the facts the parties want the Court to notice cannot be accurately and readily determined from sources whose accuracy cannot be reasonably questioned. See Fed. R. Evid. 201. Given the nature of the documents at issue and the purposes for which the parties seek to utilize them, the Court declines to take judicial notice of the documents, their import, and the extent to which each party may have been familiar with them at the motion for judgment on the pleadings stage of the case.

### III. Legal Standard

Federal Rule of Civil Procedure 12(c) provides that a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." Cunningham v. Dist. Attorney's Office for Escambia Cty., 592 F.3d 1237, 1255 (11th Cir. 2010) (quoting Andrx Pharm., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1232-33 (11th Cir. 2005)). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014) (citation omitted). In assessing a motion for judgment on the pleadings, the Court "must accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001) (citing Mergens v. Dreyfoos, 166 F.3d 1114, 1116-17 (11th Cir. 1999)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

AO 72A
(Rev. 8/82)

A motion for judgment on the pleadings pursuant to Rule 12(c) requires a court to assess the same question as a motion to dismiss under Rule 12(b)(6): whether the complaint has stated a claim for relief. Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.8 (11th Cir. 2002); Provident Mut. Life Ins. Co. of Philadelphia v. City of Atlanta, 864 F. Supp. 1274, 1278 (N.D. Ga. 1994) ("A motion for judgment on the pleadings is subject to the same standard as is a Rule 12(b)(6) motion to dismiss.") (citations omitted). While both parties reference cases construing Rule 12(b)(6) in their statement of the applicable legal standard in this case, the Court considers this motion as one for judgment on the pleadings, contrary to Plaintiffs' suggestion that Defendants' concededly seek relief under Rule 12(b)(6). See United States v. Bahr, 275 F.R.D. 339, 340 (M.D. Ala. 2011) ("The main difference between [a motion for judgment on the pleadings and a motion to dismiss] is that a motion for judgment on the pleadings is made after an answer and that answer may also be considered in deciding the motion."). Thus, as with a motion to dismiss under Rule 12(b)(6), under Rule 12(c), "[t]he complaint's allegations must plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff's complaint should be dismissed." See Boyd v. Peet, 249 F. App'x 155, 157 (11th Cir. 2007) (citing Twombly, 550 U.S. at 555, 570).

Though Plaintiffs suggest that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]" Dkt. No. 12, p. 3 (quoting Brooks v. Blue Cross and Blue Shield of Fla. Inc., 116 F.3d 1364, 1369 (11th Cir. 1997)), in Twombly, the United States Supreme Court retired the "no set of facts" language which was previously used to describe the motion to dismiss standard. Boyd, 249 F. App'x at 157 (citing Twombly, 550 U.S. at 562-63).

9

According to Twombly, a complaint warrants dismissal where the plaintiffs fail to "nudge[] their claims across the line from conceivable to plausible[.]" 550 U.S. at 570.

## IV. Discussion

### a. State Law Claims

#### i. Claims against DPS

Under the Georgia Tort Claims Act ("GTCA"), the state of Georgia

> waives its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances; provided, however, that the state's sovereign immunity is waived subject to all exceptions and limitations set forth in this article.

O.C.G.A. § 50-21-23.

Defendants contend that Plaintiffs' state tort claims against DPS are barred by sovereign immunity, despite the state's waiver of sovereign immunity, because at least one and possibly two enumerated exceptions to the waiver are applicable. Dkt. No. 6-2, pp. 8-12. Defendants first point to O.C.G.A. § 50-21-24(6), which "provides an exception to the waiver of sovereign immunity for losses resulting from 'the failure to provide, or the method of providing, law enforcement, police or fire protection[.]'" Dkt. No. 6-2, p. 8 (citing O.C.G.A. § 50-21-24(6)). In Georgia Forestry Commission v. Canady, the Supreme Court of Georgia interpreted this exception as covering the acts or omissions of state employees in both making policy decisions and in executing and implementing policies. 632 S.E.2d 105, 109-10 (Ga. 2006). However, the Supreme Court of Georgia later found this exception to the waiver of sovereign immunity to be inapplicable to allegations of tortious implementation of valid policies by state employees. Ga. Dep't of Pub. Safety v. Davis, 676 S.E.2d 1, 3 (Ga. 2009). As a result, "[t]he state is not immune from liability where its employee is implementing a non-defective policy, but does so in a

10

negligent manner." Id. Though Defendants generally deny Plaintiffs' contentions that DPS policies were violated, Dkt. No. 6-2, p. 9, Defendants concede that this exception is not at issue in this motion, because Plaintiffs have alleged that DPS policies were violated. Dkt. No. 15, p. 4.

Defendants also assert that sovereign immunity bars Plaintiffs' claims against DPS because of the exception to the sovereign immunity waiver enumerated in O.C.G.A. § 50-21-24(7). Dkt. No. 6-2, pp. 9-10. That provision provides that "[t]he state shall have no liability for losses resulting from . . . (7) [a]ssault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, or interference with contractual rights[.]" O.C.G.A. § 50-21-24(7). Plaintiffs maintain that this exception to the waiver of sovereign immunity is inapplicable because they are not seeking to hold DPS liable for any assault or battery on Dixon. Dkt. No. 12, pp. 9-10. However, the Supreme Court of Georgia has held that the focus of this exception is not "on the duty allegedly breached by the State but on the act causing the underlying loss[.]" Youngblood v. Gwinnett Rockdale Newton Cmty. Serv. Bd., 545 S.E.2d 875, 878 (Ga. 2001).

Defendants argue that "if a use of force is excessive or unjustified, then it is by definition an assault and battery." Dkt. No. 6-2, pp. 9-12. The Court is not convinced that this need always be the case, depending on the facts alleged in the particular case and how they line up with the elements of those two distinct causes of action. However, if the act causing the underlying loss alleged by the plaintiffs in a given case constitutes a battery, O.C.G.A. § 50-21-24(7) precludes the State from being held liable. In Georgia, the Court of Appeals has found that "[a]ny act of physical violence (and the law will not draw a line between different degrees of violence), inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact, constitutes an assault and battery." Greenfield v. Colonial Stores,

11

Inc., 139 S.E.2d 403, 405 (Ga. Ct. App. 1964) (citation omitted). Plaintiffs allege that Williford shot Dixon unlawfully and unnecessarily. Dkt. No.1-1, ¶¶ 35, 97-105, 114. However, the Court is not required to accept the legal conclusions in Plaintiffs' Complaint as true. See Iqbal, 556 U.S. at 678. With that being the case, the Court does not yet know whether the act that caused the underlying loss in this case was an assault and battery, because issues regarding the necessity and privilege of the use of force remain to be decided. As a result, the Court reserves ruling on whether or not Plaintiffs' state law claims against DPS are barred by O.C.G.A. § 50-21-24(7) at this time.

### ii. Claims against Williford

Defendants maintain that, to the extent Plaintiffs are attempting to assert a state tort claim against Williford, the claim is barred by the GTCA, which provides that "[a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." Dkt. No. 6-2, p. 4 n.3 (quoting O.C.G.A. § 50-21-25(a)). While Plaintiffs agree with this general principle, they argue that this issue is not ripe and should be reserved until after discovery is conducted, because of the possibility that discovery might show that Williford was not acting with the scope of his official duties or employment with DPS at the time of the relevant conduct. Dkt. No. 12, p. 11. Plaintiffs allege that the "SWAT team members were acting within the scope of their official duties and/or employment with [DPS]" during the call-out operation. Dkt. No 1-1, ¶ 19. Plaintiffs do not point to any facts in the Complaint that would suggest otherwise. In the absence of anything in the Complaint suggesting that Williford's conduct was outside the scope of his official duties or employment, Plaintiffs' tort claims against Williford are barred by the GTCA.

AO 72A
(Rev. 8/82)

As for Plaintiffs' state constitutional claims against Williford, Defendants argue that there is no private right of action under the Georgia Constitution. Dkt. No. 6-2, p. 12. Plaintiffs agree with this contention but suggest that they may have stated a claim against Williford under the Georgia Constitution by way of the GTCA, and any ruling on this issue should be reserved until after discovery for the reasons discussed above. Dkt. No. 12, p. 11. Again, given the absence of any allegation or factual indication that Williford was not acting in the scope of his official duties or employment, Plaintiffs' state constitutional claims against Williford, to the extent that they were viable, would be barred by the GTCA. Moreover, as both parties acknowledge, Georgia has "no equivalent to 42 U.S.C. § 1983, which gives a claim against a state officer individually for certain unconstitutional acts." Howard v. Miller, 476 S.E.2d 636, 639 (Ga. Ct. App. 1996). Thus, Plaintiffs have failed to state a claim against Williford under the Georgia Constitution.

### b. Federal Law Claims[4]

Plaintiffs bring a Fourth Amendment claim against Williford, pursuant to 42 U.S.C. § 1983, based on his alleged excessive use of force in the seizure of Dixon. Dkt. No. 1-1, ¶¶ 101-104, 116. Defendants argue that Plaintiffs have failed to allege a Fourth Amendment violation and that Williford is entitled to qualified immunity. Dkt. No. 6-2, pp. 13, 18.

"In order to obtain qualified immunity, an official must first establish that he acted within his discretionary authority." Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013) (citation omitted). Here, Plaintiffs do not appear to dispute that Williford acted within his discretionary capacity when he shot Dixon. Dkt. No. 1-1, ¶ 115 ("WILLIFORD in his individual

---

[4] The Court reads Plaintiffs' Complaint as asserting federal claims against Williford only. Plaintiffs have never argued otherwise. In Defendants' Motion for Judgment on the Pleadings, Defendants argue that, to the extent Plaintiffs are attempting to assert a federal claim against DPS, it would be prohibited by the Eleventh Amendment. Dkt. No. 6-2, p. 4 n.5. Plaintiffs did not respond to Defendants' argument on this point, which further supports the Court's reading of the Complaint. Cf. Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citations omitted).

capacity does not enjoy immunity for the performance of his discretionary function in using deadly-force upon James M. Dixon, III."). The burden then shifts to Plaintiffs, who must show that Williford's conduct violated Dixon's constitutional rights and that the law clearly established those rights at the time of the alleged misconduct. Morton, 707 F.3d at 1281 (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

"Freedom from unreasonable searches and seizures under the Fourth Amendment 'encompasses the right to be free from excessive force during the course of a criminal apprehension.'" Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015) (quoting Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009)). The standard for assessing whether a particular use of force was excessive under the Fourth Amendment is one of "objective reasonableness." Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007) (citing Graham v. Connor, 490 U.S. 386, 388 (1989)).

The Court, in evaluating whether the use of force at issue was objectively reasonable, must "carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." Harper v. Perkins, 459 F. App'x 822, 825 (11th Cir. 2012) (quoting Graham, 490 U.S. at 396). In balancing the need to use some force in making an arrest against the arrestee's constitutional rights, courts evaluate several factors, including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002) (citing Graham, 490 U.S. at 397). The Court will assess Williford's actions from the perspective of a reasonable officer on the scene, rather than through the lens of hindsight, as the Supreme Court has counseled that the

AO 72A
(Rev. 8/82)

reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Harper, 459 F. App'x at 825 (quoting Graham, 490 U.S. 396-97).

### i. Severity of the Crime at Issue

Looking to the Plaintiffs' Complaint, Dixon was considered a barricaded gunman who possibly had a long gun, and there was a warrant for his arrest. Dkt. No. 1-1, ¶¶ 18, 56, 70. The Complaint acknowledges that there was a firearm in Dixon's possession. Id. at ¶ 110-11. Defendants' arguments about the severity of the crime at issue are primarily based on the contents of the arrest warrant, which the Court has determined are not subject to judicial notice at this stage in the proceedings. While Defendants suggest that "it is not plausible that the troopers on the scene would not be told of the subject's dangerous activities that brought them there[,]"[5] Dkt. No. 15, p. 7, the Court is confined to reviewing the pleadings at this stage and to do so in a light most favorable to the Plaintiffs. That being said, it is unknown, from the Complaint, how severe the crime was that brought a team of law enforcement officers to Dixon's home on February 19, 2012. The arrest warrant could have been for a minor, non-violent crime, and Defendants have not indicated what crime, if any, being a barricaded gunman constituted, in this case. Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that this factor weighs in Plaintiffs' favor at this stage in the proceedings. The unknown severity and possible minor nature of the crime which brought law enforcement to Dixon's residence weighs against the reasonableness of Williford's use of deadly force, at least at this very early, pre-discovery, stage.

---

[5] As an aside, the Court disagrees with the certitude of this assertion. This is an issue that would be more appropriately explored and fleshed out in discovery.

### ii. Immediate Threat to the Safety of the Officers

Plaintiffs allege that Dixon did not attempt to use the firearm in his possession, did not point the firearm at anyone, and did not physically or verbally resist any law enforcement officer. Dkt. No. 1-1, ¶¶ 110-112. Moreover, Plaintiffs contend that Dixon was never warned by any SWAT team member that deadly force would be used if he did not drop his weapon and surrender. Dkt. No. 12, p. 18 (citing Dkt. No 1-1, ¶¶ 79-80). Thus, Plaintiffs contend that the SWAT team members, including Williford, did not observe Dixon undertaking in any conduct that posed a threat to the safety of the officers on the scene or to others. Id. Defendants, for their part, argue that Dixon was outside with a gun, and there was no indication that he was going to relinquish it. Dkt No. 6-2, p. 16 (citing Dkt. No 1-1, ¶ 60 (Dixon turned off his car), ¶ 111 (Dixon never pointed the firearm in his possession at anyone)). According to Defendants, Williford thought Dixon was too close to the officers for their safety and decided to fire on him for their protection. Id. (citing Dkt. No. 1-1, ¶ 72 ("Williford stated 'that the Appling County Sheriff's Office personnel were still too close to the scene for safety' and 'indicated that he decided to engage the subject at this time to de-escalate the situation before it got worse[.]'")). Defendants suggest that while Dixon's removal of the keys from his ignition and throwing them into the yard lessened the threat to people located away from the call-out location, it did not diminish the threat to the officers still on the scene, as it allegedly increased the notion that he was going to stand and fight. Dkt. No. 6-2, p. 17.

Again, at this early stage, this factor can cut both ways. Frankly, it is not possible to state whether this factor weighs in favor of one side or the other at this time.

### iii. Actively Resisting or Attempting to Evade Arrest by Flight

Plaintiffs allege that Dixon never physically or verbally resisted any law enforcement officer. Dkt. No. 1-1, ¶ 112. After the SWAT team's arrival, Dixon never tried to leave the call-out location. Id. at ¶ 59. Plaintiffs contend that just before he was shot, he turned off his running vehicle, removed the keys from his ignition, and threw the keys into his yard. Id. at ¶ 60. Defendants argue that, while Dixon was not firing at law enforcement, he was engaged in a "standoff" with them for hours after the arrest warrant was issued. Dkt. No. 6-2, p. 17 (citing Dkt No. 1-1, ¶ 21 (first trooper arrived at 6:49 am); Id. at ¶ 35 (Dixon shot at 8:42 am)). Defendants contend that nothing in the Complaint suggests that a reasonable officer on the scene would have understood Dixon's actions as an attempt to surrender. Dkt. No. 15, p. 10.

Though the factors are difficult to consider without more information at this stage, viewing the factual allegations in the light most favorable to Plaintiffs at this stage in the proceedings, the Court finds that Plaintiffs have stated a plausible claim that Dixon's Fourth Amendment rights were violated by Williford's deadly use of force, or that Williford's actions were not objectively reasonable under the circumstances. If Dixon committed a crime that was not severe, was not trying to flee, and had not made any aggressive actions towards the officers, Williford's decision to "de-escalate the situation before it got worse" by shooting Dixon, because the "Appling County Sheriff's Officer personnel were still too close to the scene for safety" seems at least plausibly unreasonable to an objective officer on the scene. See Dkt No. 1-1, ¶ 72.

Plaintiffs must also show that the law clearly established the rights at issue at the time of the alleged misconduct in order to divest Williford of the protection of qualified immunity. See Morton, 707 F.3d at 1281.

To determine whether or not Williford's conduct was so far beyond the hazy border between excessive and acceptable force that Williford had to know he was violating the Constitution even without case law on point, the Court must assess whether it would be clear to every reasonable officer that the force used was excessive under the circumstances. See Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009). Though it is certainly not the Court's intention to engage in hindsight analysis, it must use what little information it has, at this stage, about what actually happened to inform its analysis about what a reasonable officer on the scene would have done. Part of the limited information the Court has is that many officers were on the scene and did not shoot at Dixon or, from what is alleged in the Complaint, contemplate doing so. Only Williford chose to "de-escalate" the situation "before it got worse[.]" Given these facts, the Court finds that it is plausible that Williford may not be entitled to qualified immunity because of the obvious clarity doctrine, and it reserves ruling on whether or not Williford is entitled to qualified immunity at this stage.

### V. Conclusion

Defendants' Motion is **GRANTED IN PART**, as to Plaintiffs' state law claims against Williford, and **DENIED IN PART**, as to Plaintiffs' state law claims against DPS and federal claims against Defendant Williford. The Court in no way rules that the remaining claims will or will not survive summary judgment.

AO 72A
(Rev. 8/82)

18

**SO ORDERED**, this 22ND day of September, 2015.

　　　　　　　　　　　　　　　　/s/ Lisa Godbey Wood
　　　　　　　　　　　　　　　　LISA GODBEY WOOD, CHIEF JUDGE
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　　　　　　　　SOUTHERN DISTRICT OF GEORGIA