# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

SUE BRANNEN DIXON,
JAMES M. DIXON, JR.,

    Plaintiffs,

v.

GEORGIA DEPARTMENT OF
PUBLIC SAFETY; ALBERT
HARVEY WILLIFORD,

    Defendants.

2:14-cv-47

## ORDER

This Matter comes before the Court on Defendant Albert Williford's and Defendant Georgia Department of Public Safety's ("DPS") Motion for Summary Judgment (Dkt. No. 39). These Motions have been fully briefed and are now ripe for review. For the following reasons, Williford's Motion is **GRANTED**, and DPS's Motion is **REMANDED** to the state court along with all remaining state law claims.

## BACKGROUND

On February 19, 2012, local law enforcement in Appling County requested the assistance of the Georgia State Patrol's State Special Weapons and Tactics ("SWAT") Team in dealing with a barricaded gunman at the gunman's home. Dkt. No. 39-2/46-1

¶ 41 (Defendant's Statement of Undisputed Material Facts to which Plaintiff has admitted, hereinafter "SUMF"[1]); Dkt. No. 39-3, Ex. 13 at 2. Cpl. Williford was one of the SWAT officers mobilized to respond to the barricaded gunman situation. SUMF ¶ 43; Dkt. No. 39-3, p. 24. The callout location was the house of James Dixon,[2] located in a rural area at the back of a wide open field. SUMF ¶ 44; Dkt. No. 39-3, p. 55, Ex. P4. Williford arrived at the callout location at approximately 7:30 a.m. SUMF ¶ 45; Dkt. No. 39-3, p. 28. He knew that an Appling County judge had issued an aggravated assault arrest warrant for Dixon earlier that morning and that he (Williford) was called to assist in effectuating that arrest. SUMF ¶¶ 46, 42; Dkt. No. 39-3, p. 106; Dkt. No. 6-1, p. 2. Williford also knew that Dixon had prior military combat experience. SUMF ¶ 49; Dkt. No. 39-3, p. 108. It was Williford's understanding that earlier that morning, Dixon had discharged a firearm into a neighbor's home, taken family members hostage, and assaulted a family member with a knife. SUMF ¶ 47; Dkt. No. 39-3, pp. 106, 108.

When Williford arrived, Sergeant Shackelford advised him to set up a perimeter and deploy as a sniper. SUMF ¶ 50; Dkt. No. 39-3, p. 46. Williford had a .308 rifle with hollowpoint ammunition. SUMF ¶ 54; Dkt. No. 39-3, p. 54. He deployed to a

---

[1] When citing Defendant's Statement of Material Undisputed Facts, the Court cites only those paragraphs which Plaintiff has admitted.
[2] "Dixon" hereinafter will refer to the decedent, rather than to his parents, the Plaintiffs in this action.

AO 72A
(Rev. 8/82)

location on the left side of Dixon's house (if facing the front of the house), approximately 106 yards from the house, and placed himself on the ground in an attempt to camouflage himself. SUMF ¶¶ 51, 53; Dkt. No. 39-3, pp. 50-54.

To contain Dixon, Williford tried to work with the other SWAT team members according to their regular practice to establish inner and outer perimeters around Dixon's house. SUMF ¶ 54; Dkt. No. 39-3, p. 64, Ex. P14. But SWAT did not have sufficient manpower to complete the inner or the outer perimeter. SUMF ¶¶ 57; Dkt. No. 39-3, pp. 96-97. This left an opening around the rear of the house, leaving Williford to wonder what means of escape in that direction Dixon might have. SUMF ¶ 59; Dkt. No. 39-3, p. 97. Williford testified that he was concerned about Dixon escaping from the rear of the house through the woods. SUMF ¶ 60; Dkt. No. 39-3, p. 98, Ex. 4.

When Williford arrived, Dixon was inside his house. The events are depicted in a video that was provided by Defendants in support of their motion for summary judgment. While Dixon was inside, an armored vehicle called a Bearcat began to deploy to the right side of the house to assist troopers in setting up the perimeter. SUMF ¶ 62; Dkt. No. 39-3, pp. 70-71, Ex. 11, 12, 14. Williford was informed that "James [Dixon] had stated that he was coming out to fight or he was coming out with his boots

on, or it wasn't to surrender, something to that degree." SUMF ¶ 61; Dkt. No. 39-3, pp. 128-29.

Some time after the sun rose, Dixon exited the house and began to move around the area near his truck. SUMF ¶ 65; Dkt. No. 12-1 beginning at ~1:58:41. He was carrying a long gun and wearing a bullet proof vest and two bandoliers of ammunition strapped across his chest. SUMF ¶ 66; Dkt. No. 12-1 at ~1:58:41; Dkt. No. 39-3 at 2; Dkt. No. 39-6. Williford did not know whether Dixon's gun was loaded or whether the safety was on. SUMF ¶ 68; Dkt. No. 39-3, pp. 81, 117-18.

Trooper Lamb was in the Bearcat. SUMF ¶ 63; Dkt. No. 39-3, p. 70. Using a public address system, Lamb repeatedly instructed Dixon to drop his weapon.[3] SUMF ¶ 69; Dkt. No. 39-3, p. 125-26. Dixon failed to comply. SUMF ¶ 70; Dkt. No. 39-3, pp. 119-20; Dkt. No. 12-1 at ~1:58:41. Dixon held the gun such that it was pointed up vertically. SUMF ¶ 71; Dkt. No. 12-1, pp. 117-18.

Williford testified that he was concerned that Dixon might be trying to leave in his truck and endanger the public. SUMF ¶ 73; Dkt. No. 39-3, p. 109. To prevent such an occurrence, he fired his first shot. SUMF ¶ 74; Dkt. No. 39-3, p. 109. The

---

[3] The Court notes that this evidence comes from Williford's testimony, although it was not made clear whether Williford could hear the officers' commands from his position. Still, Plaintiffs admitted the truth of the statement in their answer to Defendants' Statement of Undisputed Material Facts.

video evidence shows that at the time of the first shot, Dixon was standing outside of his truck with both feet on the ground. Plaintiffs' Additional Facts to which Defendant agrees ("PAF") ¶ 12; Dkt. No. 12-1. He reached into the truck, turned off the ignition, and threw the keys into the yard. Id. Williford testified that he could not tell what Dixon was doing when he reached inside the truck. Dkt. No. 39-3, p. 118.

Within a minute of firing the first shot and concerned for the safety of the nearby officers, Williford shot and killed Dixon at 8:42 a.m. SUMF ¶ 82; Dkt. No. 39-3, p. 109; Dkt. No. 1-1 at 7 ¶ 35, and at 37 ¶ 35; PAF ¶ 1. He testified that he did so because Dixon had "put himself in a position to shoot at officers" and wanted to deescalate the situation before it got worse because of Dixon's proximity to the sheriff's deputies. PAF ¶¶ 9, 10; Dkt. No. 39-3, pp. 24, 91-94. Williford also testified that he believed Dixon looked in Williford's direction after the first shot was fired. Id. p. 53.

When Williford fired the fatal shot, three deputies standing near the Bearcat were within range of Dixon's gun, and Williford did not know whether they were wearing bullet proof vests. SUMF ¶¶ 77-78; Dkt. No. 39-3, p. 80, Ex. P14. Williford also testified that he believed himself to be within range of Dixon's gun, and he was not wearing a bullet proof vest. SUMF ¶ 79, 81; Dkt. No. 39-3, pp. 85, 68.

AO 72A
(Rev. 8/82)

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

AO 72A
(Rev. 8/82)

6

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

In a use-of-force case, the facts must be taken in the light most favorable to the plaintiff, but the determination of reasonableness must be made from the perspective of the officer. Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005). "At summary judgment, we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under

those circumstances." Stephens v. DeGiovanni, 852 F.3d 1298, 1315 (11th Cir. 2017).

When considering the record at summary judgment, "'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) (quoting Tolan v. Cotton, 572 U.S. __, 134 S. Ct. 1861, 1863 (2014)). But in cases with a video in evidence, the Court "'view[s] the facts in the light depicted by the videotape.'" Shaw, 884 F.3d at 1098 (quoting Scott v. Harris, 550 U.S. 372, 380-81 (2007)).

**DISCUSSION**

Plaintiff has asserted a 18 U.S.C. § 1983 claim against Defendant Williford based on the officer's use of excessive force. Such a claim requires the plaintiff to show that he was deprived of a civil right by a person acting under color of state law. DeGiovanni, 852 F.3d at 1314. The Supreme Court has held that all claims of excessive force shall be examined under the Fourth Amendment and its reasonableness standard. Tennessee v. Garner, 471 U.S. 1, 7 (1985). Thus, the critical question for evaluating whether a particular application of force is excessive under the Fourth Amendment is whether it was objectively reasonable. Smith v. LePage, 834 F.3d 1285, 1294 (11th Cir. 2016).

Williford has raised the defense of qualified immunity. This defense grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Under this analysis, the officer must first prove that he was acting within the scope of his discretionary authority. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Then, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. "It is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." DeGiovanni, 852 F.3d at 1320 (internal citation omitted). "Deadly force is, of course, the most severe deprivation, and the government must have significant interests to justify it." LePage, 834 F.3d at 1295 (internal citations omitted).

Thus, the Court is tasked with scrutinizing the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989); see also Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (reiterating the

three Graham factors). So, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

To apply the Graham factors to this case, the Court must begin with the severity of the crime for which the plaintiff was being arrested. Here, Dixon was being arrested for a serious and violent offense: aggravated assault. SUMF ¶ 42. Williford was aware of this arrest warrant and understood that he was called to Dixon's house to assist in carrying it out. SUMF ¶ 46; Dkt. No. 39-3, p. 106. Aggravated assault is not only a felony under Georgia law, but also a violent crime. See O.C.G.A. § 16-5-21(b) (punishing aggravated assault with imprisonment for at least a year); § 16-5-21(a) (enumerating the four different ways to commit aggravated assault, all of which are violent).

More specifically, Williford's understanding of the facts surrounding the commission of the aggravated assault was that

earlier that morning, Dixon had discharged a firearm into a neighbor's home, taken family members hostage, and assaulted a family member with a knife. SUMF ¶ 47; Dkt. No. 39-3, p. 106, 108. So the facts as Williford reasonably understood them demonstrate that Dixon had committed a violent crime and exhibited a willingness to inflict physical harm on others, including by firing a gun into a house. See also Greer v. Ivey, 242 F. Supp. 3d 1284, 1306 (M.D. Fla. 2017) (coming to the same conclusion on the first Graham factor where the crime was aggravated assault under Florida law).

The second Graham factor is the immediacy of the threat posed by the plaintiff. Here, the facts show that when his house was surrounded by officers, Dixon communicated his intention not to surrender, that he exited his house and walked toward his truck, that his truck was running with its keys in the ignition, that he was carrying a long rifle or shotgun, and that he was wearing a bullet proof vest and two bandoliers of ammunition across his chest. SUMF ¶¶ 66, 61, 65; Dkt. No. 39-3, p. 2, 128-29; Dkt. No. 6-1. Williford testified that he fired the first shot when Dixon opened the door to his truck, in order to prevent Dixon from leaving. SUMF ¶¶ 74-75; Dkt. No. 39-3, pp. 109, 79. He fired the second shot just moments later, while Dixon was still within feet of the driver's door of his truck. The undisputed facts also show that three deputies were in range

of Dixon's gun at the time that Williford fired both shots. SUMF ¶ 77; Dkt. No. 39-3, p. 80. Taken together, these facts sufficiently demonstrate that Williford reasonably concluded that Dixon posed an immediate threat, either of harming the officers, harming Williford, or escaping and harming the public. True, Dixon did not point the gun at or verbally threaten anyone on the scene, but the law does not require the threat posed to be as conclusive as that before an officer can act to protect against it.

The Eleventh Circuit recently visited the immediacy prong in <u>Shaw v. City of Selma</u>. 884 F.3d 1093 (11th Cir. 2018). The court rejected the argument that the decedent must raise his weapon for the threat posed to be immediate. <u>Id.</u> at 1099. There, the decedent was within a few feet of and advancing on the officer with a hatchet in his hand, and the officer had been warned that the decedent would fight him. <u>Id.</u> There, as here, those that could be harmed by the plaintiff's weapon were within its range, and the officer had been told that the decedent would not surrender.

This holding is consistent with prior Eleventh Circuit precedent. <u>Singletary v. Vargas</u>, 804 F.3d 1174, 1183 (11th Cir. 2015) (quoting <u>Long v. Slaton</u>, 508 F.3d 576, 581 (11th Cir. 2007)("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a

deadly weapon to act to stop the suspect.")); Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether [the decedent] had drawn his gun, [his] gun was available for ready use, and [the officer] was not required to wait and hope for the best [before using deadly force to stop him].") (quotation marks omitted).

The third Graham factor is whether the decedent was resisting the officers' commands. The facts show that through the Bearcat's public address system, Trooper Lamb repeatedly instructed Dixon to drop his weapon, and that he failed to do so. SUMF ¶¶ 69-70.

Examining all of the factors together, the undisputed facts show that Williford had probable cause to believe that Dixon "pose[d] a threat of serious physical harm." Penley, 605 F.3d at 851.

It is always a tragedy when an officer shoots and kills someone. This case is no exception. Counsel for Plaintiff has pointed out that there was no moment of escalation that usually warrants firing a gun, that the setting was a wide open field from which Dixon would have difficulty escaping. Counsel argues that it would have been preferable for the officers to warn Dixon that they would shoot, or to shoot to disable the truck or to disable Dixon himself. True, in the safe and quiet setting of the courtroom, such critique is easy and often accurate.

However, the United States Supreme Court reiterated this month that "'[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight.'" Kisela v. Hughes, 584 U.S. \_\_ (2018) (quoting Graham, 490 U.S. 386, 396 (1989)).

In the present case, the Court does not need to decide whether Williford violated the Constitution when he shot Dixon. Looking at the undisputed facts and circumstances in this case, it is clear that Williford is entitled to qualified immunity. Such immunity attaches because Williford did not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. Williford had no fair notice that his conduct would be unlawful. If anything, relevant prior caselaw guides him toward determining that his conduct was lawful. In any event, summary judgment based on qualified immunity is in order.

## CONCLUSION

Williford's Motion for Summary Judgment, dkt. no. 39, is **GRANTED**. All that remains are state law claims. DPS's Motion for Summary Judgment, dkt. no. 39, is **REMANDED** along with any

state law claims to the Superior Court of Appling County.[4] The Clerk of Court is **DIRECTED** to close the case.

**SO ORDERED**, this 18th day of April, 2018.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[4] The pending motion to exclude expert testimony, dkt. no. 38, is also remanded.